UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 98-1020

SHARON LAURIN,

Plaintiff, Appellant,

v.

THE PROVIDENCE HOSPITAL AND
MASSACHUSETTS NURSES ASSOCIATION,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank H. Freedman, Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Campbell and Cyr, Senior Circuit Judges,

Tani E. Sapirstein, with whom Charles A. Lynch III and Sapirstein
& Sapirstein, P.C. were on brief for appellant.
Maurice M. Cahillane,with whom Egan, Flanagan & Cohen was on brief
for appellee Providence Hospital.
Jack J. Canzoneri, with whom McDonald & Associates was on brief for
appellee Massachusetts Nurses Association.

July 28, 1998

CYR, Senior Circuit Judge. Plaintiff Sharon Laurin, a
registered nurse who was discharged from her employment, challenges
a summary judgment ruling which dismissed her claims for relief
under the Americans With Disabilities Act, see 42 U.S.C. 
12112(a) ("ADA"), its state-law counterpart, Mass. Gen. Laws ch.
151B, 4(16) ("Chapter 151B"), and the collective bargaining
agreement ("CBA") between her former employer and her union. We
affirm the district court judgment.
I
BACKGROUND
From 1989 until August 1995, Laurin worked as a staff
nurse in the 24-hour maternity unit at The Providence Hospital
("Hospital"). Staff nurses principally worked one of three shifts: 
days (7:00 a.m. - 3:30 p.m.), evenings (3:00 p.m. - 11:30 p.m.), or
nights (11:15 p.m. - 7:15 a.m.). In order to cover the less
desirable evening and night shifts, the Hospital required all non-
senior day nurses to work approximately one-third of their
scheduled hours either on the evening or the night shift. Laurin
worked this so-called "days rotating" position throughout her
tenure.
In 1993, Laurin returned to graduate school on a part-
time basis after receiving permission from her supervisor to reduce
her work week from 40 to 32 hours. During the 1995 spring
semester, her supervisor authorized a further, temporary reduction
from 32 hours to 24, which enabled Laurin to retain the benefits
commensurate with a 32-hour position. The Hospital posted neither
of these part-time nursing positions before offering them to
Laurin. Notwithstanding her reduced work schedule, Laurin
continued to rotate shifts.
After completing the night shift on April 26, 1995,
Laurin blacked out at the wheel while driving home. Her primary-
care physician, as well as a neurologist, diagnosed the event as
syncope, or fainting. The neurologist concluded that Laurin should
refrain from "long periods without sleep" and keep to a "regular
schedule of work hours," or "one [consistent] shift." He added that
a regular daytime shift would be "most beneficial" since Laurin had
small children who were primarily in need of her attention during
daytime hours.
Laurin presented the neurologist's report to her
immediate supervisors, and requested permanent reassignment to a
days-only position in the maternity unit. According to Laurin, her
supervisors initially observed, "in a laughing manner," that "they
probably weren't going to be able to accept this note" because
other days-rotating nurses with small children inevitably would beg
off their shift-rotation assignments as well. Laurin then
contacted a representative from the Massachusetts Nurses
Association ("MNA"), the union representing staff nurses at the
Hospital. At a meeting attended by the MNA representative, Laurin
was advised by her supervisors that "they would check into it
[viz., the requested accommodation]." Meanwhile, the MNA polled
the staff nurses in the maternity unit, the majority of whom
objected to a days-only position for Laurin and refused to
volunteer to cover her evening and night shifts.
On May 24, 1995, the Hospital's human resources
department sent a letter advising that shift rotation was an
"essential function" of Laurin's position, mandated by the CBA
between the Hospital and the MNA. Nevertheless, as a temporary
accommodation the Hospital proposed to assign Laurin to a days-only
schedule for six weeks, during which time she was to consult with
human resources personnel about any alternative days-only job
positions (e.g., operating room) available at the Hospital. 
Notwithstanding her refusal to sign the proposal letter due to its
characterization of her medical condition as a "lifestyle problem,"
the Hospital nonetheless granted Laurin a temporary days-only
assignment for the six-week period.
On the early morning of June 17, 1995, Laurin suffered a
seizure while at home sleeping. Her neurologist responded with a
report to the Hospital, adjusting his diagnosis from syncope to
seizure disorder. Concluding that the seizure had been induced by
fatigue, the neurologist opined that "a daytime position is
absolutely necessary." The Hospital nevertheless refused to
reconsider its earlier decision to deny Laurin a days-only
position, but did agree to extend the temporary accommodation until
August 7, when she was scheduled to resume work on the evening
shift. Once again Laurin contacted the MNA.
Upon reviewing her complaint the MNA declined to submit
a grievance, on the grounds that the Hospital had not violated the
CBA, other staff nurses could not be compelled to cover Laurin's
evening and night shifts, and the MNA would not support an
individual member's complaint to the detriment of its other
members. Instead, the MNA recommended that Laurin consider
obtaining an unpaid medical leave of absence, working straight-
evening shifts, or rotating day-evening shifts (i.e., no nights). 
After Laurin refused, the MNA informed her in writing
that she had the right to pursue a grievance, and outlined the
procedures. On August 4, Laurin filed a Step 1 grievance with the
Hospital. Notwithstanding repeated warnings that she would be
terminated, Laurin failed to appear for work on the evening of
August 7.
Following her termination, Laurin reiterated her request
that the MNA file a grievance in her behalf. The MNA again
refused. In August 1995, Laurin filed her own Step 1 and Step 2
grievances, which were denied by the Hospital following a hearing. 
After Laurin filed a Step 3 grievance based on substantially
similar allegations, the Hospital declined to respond. For its
part, the MNA informed Laurin that it would not assist in
presenting her grievances to arbitration.
Laurin filed the present action in federal district court
in January 1996. The six-count complaint alleged that by refusing
to assign her to a days-only schedule on a permanent basis the
Hospital had violated the ADA and its state counterpart, Chapter
151B, and breached the CBA; and, further, that by refusing to file
grievances and to pursue arbitration in her behalf the MNA had
violated the ADA and Chapter 151B, and breached its duty of fair
representation. After the defendants successfully moved for
summary judgment on all counts, Laurin appealed.
II
DISCUSSION
A. The ADA and the Chapter 151B
Claims Against the Hospital
Laurin first contends that the Hospital was not entitled
to summary judgment on the ADA and Chapter 151B claims because the
issue as to whether shift rotation was an "essential function" of
her former position presented a quintessential question of fact for
the jury. An ADA claimant alleging handicap discrimination must
prove by a preponderance of the evidence that: (1) she was
"disabled" within the meaning of the ADA; (2) she was a "qualified
individual," i.e., that either with or without reasonable
accommodation she was able to perform the "essential functions" of
her former position; and (3) her discharge was due, in whole or in
part, to her disability. See EEOC v. Amego, Inc., 110 F.3d 135,
141 n.2 (1st Cir. 1997); Katz v. City Metal Co., 87 F.3d 26, 30
(1st Cir. 1996).
It is well settled that an employer need not accommodate
a disability by foregoing an "essential function" of the employment
position. See, e.g., Miller v. Illinois Dep't of Corrections, 107
F.3d 483, 484 (7th Cir. 1997) ("Under the ADA, the employer avoids
all liability if the plaintiff would have been fired because
incapable of performing the essential functions of the job . . .
."); Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 140 (2d
Cir. 1995) (similar); H.R. Rep. No. 101-485(II), at 73 (1990);
accord Scheer v. City of Cedar Rapids, 956 F. Supp. 1496, 1502
(N.D. Iowa 1997) ("[T]he request to perform only some of the
essential functions of a job is not a request for reasonable
accommodation."). EEOC interpretive regulations afford guidance
in assessing whether a particular job requirement is an "essential
function" for purposes of the ADA:
(1) In general. The term essential functions
means the fundamental job duties of the
employment position the individual with a
disability holds or desires. The term
"essential functions" does not include the
marginal functions of the position.

(2) A job function may be considered
essential for any of several reasons,
including but not limited to the
following:

(i) The function may be essential
because the reason the position
exists is to perform that
function;
(ii) The function may be essential
because of the limited number of
employees available among whom
the performance of that job
function can be distributed;
and/or
(iii) The function may be highly
specialized so that the incumbent
in the position is hired for his
or her expertise or ability to
perform the particular function.

(3) Evidence of whether a particular function
is essential includes, but is not limited
to:

(i) The employer's judgment as to
which functions are essential;
(ii) Written job descriptions prepared
before advertising or
interviewing applicants for the
job;
(iii) The amount of time spent on the
job performing the function;
(iv) The consequences of not requiring
the incumbent to perform the
function;
(v) The terms of a collective
bargaining agreement;
(vi) The work experience of past
incumbents in the job; and/or
(vii) The current work experience of
incumbents in similar jobs.

29 C.F.R. 1630.2(n); see Grenier v. Cyanamid Plastics, Inc., 70
F.3d 667, 672 (1st Cir. 1995) (noting that EEOC regulations
interpreting the ADA, while not controlling, constitute "'a body of
experience and informed judgment to which courts . . . may properly
resort for guidance'") (citation omitted); see also 42 U.S.C. 
12111(8).
The initial salvo by Laurin is aimed at what she
considers the inappropriately high level of deference the district
court accorded the Hospital's determination, pursuant to 29 C.F.R.
1630.2(n)(3)(i), that shift-rotation is an essential function. 
Such deference is not appropriate, Laurin says, because she had
adduced direct evidence of the Hospital's discriminatory attitude
toward her particular handicap. Cf. Amego, 110 F.3d at 145
(endorsing considerable deference to employer's judgment as to
"essential function" "[w]here the plaintiff has presented noevidence of discriminatory intent, animus, or even pretext")
(emphasis added). Specifically, Laurin contends that the Hospital
and her supervisors responded to her requests for accommodation
with "incredulous refusal[s]," declined to take them "seriously," and
belittled her medical condition as a mere "lifestyle problem." On
the contrary, close inspection of Laurin's record citations, even
viewed in their most favorable light, belie her contention.
Assuming arguendo that Laurin plausibly interprets Amego,
the only concrete allegation among the lot is that her direct
supervisors (viz., Claire Margosiak and the director of nursing,
Joan Richter) reacted in a "laughing manner" to her initial request
for accommodation. Even assuming as much, Laurin's claim is
nonetheless flawed, since she was not diagnosed as having a seizure
disorder until later, after experiencing her second episode. Such
spontaneous remarks, made long before the supervisors had an
opportunity adequately to assess the merits of the requested
accommodation, could be considered only marginally probative of any
discriminatory animus on their part.
Furthermore, the supervisors explained to Laurin that the
shift-rotation requirement would be rendered obsolete were the
Hospital to waive it for all staff nurses with small children who
might experience episodes of fatigue. Nor was their
characterization of Laurin's medical condition as a "lifestyle
problem" particularly surprising or remarkable, let alone
suspect, given that her own neurologist had opined that Laurin's
medical condition likely had been induced by the fatigue associated
with her frenetic daily activities childcare, work, and school. 
Viewed in context, therefore, the supervisors' observations
rationally cannot be considered expressions of animus towards
persons afflicted with Laurin's medical condition.
Even assuming that a rational factfinder could draw so
tenuous an inference, however, Laurin failed to adduce competent
evidence that her immediate supervisors played a meaningful role in
the subsequent Hospital decision to deny the requested
accommodation and discharge her. Instead, as Laurin concedes, the
supervisors advised her that "they would check into it," thus
strongly suggesting that any final decision must be made at a
higher level. Nor is it surprising in the least that the decision
would be made by higher-ups, given that any decision to waive the
shift-rotation requirement for the first time in Hospital history
plainly would implicate important institutional considerations. 
Cf. Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 n.8 (1st Cir.
1998) (noting that "'stray remarks in the workplace . . .,
statements by nondecisionmakers, or statements by decisionmakers
unrelated to the decisional process itself'" normally are
insufficient to establish discriminatory animus) (citation
omitted); Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 329
(1st Cir. 1996) ("Isolated, ambiguous remarks are insufficient, by
themselves, to prove discriminatory intent."). Consequently, the
letter rejecting Laurin's request for accommodation and instead
proposing a temporary six-week accommodation came from David
Tatro, the director of the Hospital's human resources department,
not from Laurin's supervisors. It is noteworthy as well that the
Tatro letter in no way indicated what, if any, role either Richter
or Margosiak played in the Hospital decision not to "waive" its
longstanding, consistently-enforced shift-rotation policy. Seealso Letter from Margosiak to plaintiff (7/6/95) ("I heard from
Human Resources today . . . [that] the decision has been made to
extend your temporary [accommodation] . . . ."). Accordingly,
Laurin's suppositional "direct" evidence of discriminatory animus
came up well short of its target.
Absent direct evidence that the Hospital harbored a
discriminatory animus in maintaining that shift-rotation was an
"essential [job] function," Laurin had no option but to resort to
the familiar McDonnell-Douglas burden-shifting paradigm to
establish a circumstantial case. See Jacques v. Clean-Up Group,
Inc., 96 F.3d 506, 511 (1st Cir. 1996); see also Snow v. Ridgeview
Med. Ctr., 128 F.3d 1201, 1206 (8th Cir. 1997). Thus, initially
Laurin was required to demonstrate a prima facie case on all three
essential elements of her claim, see supra: (1) "disability," (2)
"qualification," and (3) causation. See Amego, 110 F.3d at 141. 
Only at that point would the Hospital be required to articulate a
nondiscriminatory reason for its adverse employment actions. SeeJacques, 96 F.3d at 511:
This entails only a burden of production, not
a burden of persuasion; the task of proving
discrimination remains the plaintiff's at all
times. Once such a reason emerges, the
inference raised by the prima facie case
dissolves, and the plaintiff is required to
show, unaided by the original inference of
discrimination, that the employer's proffered
reason is a pretext for discrimination . . . .
[Plaintiff] must muster proof that enables a
factfinder rationally to conclude that the
stated reason behind the adverse employment
decision is not only a sham, but a sham
intended to cover up the proscribed type of
discrimination.

Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998)
(emphasis added) (citations omitted); see Snow, 128 F.3d at 1206
("The ultimate burden of proving unlawful discrimination always
rests with the plaintiff."); Miller, 107 F.3d at 484 ("[T]he burden
of proof on the [essential-function] issue is not on the employer
but on the plaintiff.").
Laurin vainly string-cites cases which acknowledge that
the 1630.2(n)(3) "essential function" inquiry tends to be fact-
intensive, such that it is relatively rare that a trial court may
enter summary judgment. See, e.g., Barber v. Nabors Drilling
U.S.A., Inc., 130 F.3d 702, 707 (5th Cir. 1997). Nevertheless,
since an ADA plaintiff ultimately must shoulder the burden of
establishing that she was able to perform all "essential functions"
of her position, at summary judgment Laurin and not the Hospital
bore the burden of adducing competent evidence from which a
rational factfinder could have found in her favor, see Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). See, e.g.,
Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686-87 (4th Cir.
1997) (resolving "essential function" issue in employer's favor at
summary judgment); Amego, 110 F.3d at 147 (citing Martinson with
approval); Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir.
1995) ("Although ordinarily a fact question to be decided on a
case-by-case basis, plaintiffs have presented no evidence to rebut
the [employer's] conclusion that speed is essential to the
[plaintiffs'] selector job.") (citation omitted). Nor could Laurin
satisfy her rebuttal burden under Rule 56 by relying upon
"'conclusory allegations, improbable inferences, and unsupported
speculation.'" Woods v. Friction Materials, Inc., 30 F.3d 255, 259
(1st Cir. 1994) (citation omitted).
Even assuming arguendo that Laurin adduced sufficient
evidence for a prima facie case of "qualification," the Hospital in
turn met its burden by articulating a nondiscriminatory reason for
denying the request for accommodation. Indeed, all the competent
evidence relating to the seven nonexclusive factors identified in
29 C.F.R. 1630.2(n)(3) weighed overwhelmingly in favor of the
Hospital. Hospital witnesses uniformly attested that since the 
evening and night shifts were less desirable than the day shift, it
was essential that the Hospital cover the shortage of "straight-
evening" and "straight-night" nurses by making shift-rotation an
"essential function" of all non-senior daytime nursing positions in
its 24-hour maternity unit. Thus, the Hospital has always required
all non-senior staff nurses to rotate shifts, and it has never made
an exception. See Milton, 53 F.3d at 1124 ("The initial inquiry in
determining ['essential function'] is whether an employer actually
requires all employees in the position to perform the allegedly
essential function.").
Perhaps most importantly, a 24-hour hospital unit imposes
exceptional nurse-scheduling demands upon the hospital-employer. 
For example, since maternity-room patients need nursing services
twenty-four hours a day, normally it will not be possible for the
hospital-employer to allow its maternity nurses to work only the
more desirable or convenient shifts, where to do so would
jeopardize its ability to staff its maternity unit during the less
desirable evening and night shifts. Medical needs and emergencies
many potentially life-threatening do not mind the clock, let
alone staff-nurse convenience.
At least in the instant context, to suggest otherwise
would be tantamount to maintaining that night work is not an
"essential function" of a night watchman's job, even though that is
the only time the premises are not otherwise occupied. Cf., e.g.,
Martinson, 104 F.3d at 687 (noting that provision of store security
is of such a nature that it "cannot reasonably be abandoned for
even 'a brief period'"); Salmon v. Dade County Sch. Bd., No. 96-
2711, 1998 WL 234585, at *4 (S.D. Fla. Apr. 28, 1998) ("Unlike
other jobs that can be . . . deferred until a later day, a guidance
counselor must counsel students at the school during the hours in
which the children are in attendance."). The 24-hour hospital unit
setting thus affords a particularly compelling context in which to
defer to rational staffing judgments by hospital employers based on
the genuine necessities of the hospital business. See 42 U.S.C. 
12112(b)(6) (defining term "discriminate" to include the use of
"qualification standards . . . [in]consistent with businessnecessity") (emphasis added).
Section 4.05 of the CBA likewise supported the Hospital's
judgment that shift rotation is an "essential function" of a day-
nurse position in its maternity unit. See supra note 1. By
specifying but one criterion which excuses day nurses from shift
rotation namely, the prescribed levels of seniority the CBA
plainly implied that other criteria did not warrant waivers of the
shift-rotation requirement, see, e.g., Institut Pasteur v.
Cambridge Biotech Corp., 104 F.3d 489, 495 (1st Cir.) ("'[T]he
doctrine of expressio unius est exclusio alterius instructs that
when certain matters are mentioned in a contract, other similar
matters not mentioned were intended to be excluded.'") (citation
omitted), cert. denied, 117 S. Ct. 2511 (1997), and for good
reason. Were the Hospital to waive the shift-rotation requirement
for Laurin, either other non-senior nurses or senior nurses would
have to be called upon to cover Laurin's evening and night shifts,
which at the very least would violate the Hospital's commitment
under CBA 4.05(E) to reduce the rotation obligations of its
nurses, see Foreman v. Babcock & Wilcox Co., 117 F.3d 800, 810 (5th
Cir. 1997) ("[T]he ADA does not require an employer to take action
inconsistent with the contractual rights of other workers under a
[CBA]."); cert. denied, 118 S. Ct. 1050 (1998); accord Shea v.
Tisch, 870 F.2d 786, 789-90 (1st Cir. 1989) (same, under analogous
provisions of Rehabilitation Act), or else the Hospital would have
to try to hire new nurses to cover the less desirable off-shifts. 
See, e.g., Turco v. Hoechst Celanese Corp., 101 F.3d 1090, 1094
(5th Cir. 1996) (noting that employer "has no straight day-shift
chemical operator positions all operator positions are on
rotating shifts [ so that] [m]oving one operator to a straight
day shift would place a heavier burden on the rest of the operators
in the plant"); Milton, 53 F.3d at 1125 ("An accommodation that
would result in other employees having to work harder or longer
hours is not required."); Krennerich v. Town of Bristol, 943 F.
Supp. 1345, 1351 (D. Me. 1996) (noting that ADA does not require
employers "'to assign existing employees or hire new employees'" to
perform abandoned "essential functions" of plaintiff's job position)
(quoting Gilbert v. Frank, 949 F.2d 637, 644 (2d Cir. 1991)).
Laurin attempts to demonstrate triable factual issues on
other fronts as well. First, she cites evidence that the Hospital
had accommodated her in the past by allowing her to work less than
full-time hours while she pursued her education, and that the
Hospital probably violated the CBA by offering her those "new" part-
time positions without posting them in advance. Be that as it may,
we fail to see how such evidence is relevant to whether or not
shift-rotation is an "essential function." Instead, at most it
tends to show that full-time status may not have been an "essential
function" of Laurin's staff-nurse position, which is not the
subject matter of CBA 4.05. Moreover, Laurin acknowledges that
the Hospital continued to insist that she rotate shifts even after
1993, when she assumed less-than-full-time status.
Second, we reject Laurin's claim that the temporary
eight-week accommodation, during which the Hospital allowed her to
work the straight-day shift, undercuts the Hospital's contention
that it could not cover all three shifts without the shift-rotation
requirement. From a labor-management policy standpoint, it would
be perverse to discourage employers from accommodating employees
with a temporary breathing space during which to seek another
position with the employer. Here, the Hospital actively counseled
Laurin in a bona fide attempt to locate a non-rotating position
within the Hospital. An employer does not concede that a job
function is "non-essential" simply by voluntarily assuming the
limited burden associated with a temporary accommodation, nor
thereby acknowledge that the burden associated with a permanent
accommodation would not be unduly onerous. See Shiring v. Runyon,
90 F.3d 827, 831 (3d Cir. 1996) (employer's temporary creation of
a "new" position for ADA plaintiff is irrelevant to "essential
function" inquiry).
Third, Laurin maintains that the deposition testimony of
her supervisor, Claire Margosiak, gave rise to a trialworthy issue. 
Margosiak explained that in her experience it had been easier to
find applicants willing to work straight-evening shifts than days-
rotating. As Laurin views it, this testimony undermined the
contention that the Hospital could not cover evening shifts without
rotating day nurses to the evening shift. We disagree.
To repeat, Laurin and not the Hospital bore the
burden of proof on the "essential function" element. See Dichner,
141 F.3d at 30. Once the Hospital articulated a legitimate reason
for insisting upon shift-rotation as an "essential function" 
i.e., that it could not attract enough nurses to work the off-
shifts Laurin had to adduce specific evidence to debunk the
Hospital's rationale; in other words, to support a reasonable
inference that the articulated rationale was pretextual. SeeMartinson, 104 F.3d at 687 (noting that once "[defense witnesses]
repeatedly testified that maintaining store security was an
essential function . . . [,] [plaintiff] offered no evidence to the
contrary").
Absent further context the Margosiak testimony fell well
short of the mark. For instance, absent evidence as to how many
day nurses had enough seniority to be entitled to relief from
shift-rotation, it is impossible to infer from the Margosiak
comparison that the Hospital had enough evening nurses to cover all
shifts. The Margosiak comparison that it might be easier to
fill straight-evening shifts than day positions would not
necessarily prove that the Hospital currently was able to employ
all the evening nurses it needed, and without such proof Laurin
could not establish that the Hospital did not need to tap its non-
senior day nurses to fill the void. See 29 C.F.R. 
1630.2(n)(2)(ii) (job function may be "essential" because of the
limited number of employees available to assume a necessary
function).
B. The "Duty of Fair Representation" Claim Against MNA

Finally, Laurin contends that the MNA breached its duty
of fair representation by refusing to pursue her grievances against
the Hospital. Vaca v. Sipes, 386 U.S. 171, 190 (1967); seeWilliams v. Sea-Land Corp., 844 F.2d 17, 19 (1st Cir. 1988). She
asserted a so-called "hybrid" claim, which required that she provethat (1) the Hospital breached the CBA, thereby violating National
Labor Relations Act 301, and (2) the MNA breached its duty of
fair representation by not championing her claims against the
Hospital for allegedly breaching the CBA. Failure to establish
either prong is fatal to her "hybrid" claim. See DelCostello v.
International Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983); Hinesv. Anchor Motor Freight, Inc., 424 U.S. 554, 570-71 (1976); DiPintov. Sperling, 9 F.3d 2, 4 (1st Cir. 1993); Kissinger v. United
States Postal Serv., 801 F.2d 551, 553 (1st Cir. 1986).
Laurin did not carry her burden on the first prong. SeeCelotex Corp., 477 U.S. at 322-23. While CBA 12.01 ordained that
the Hospital not discriminate against employees with disabilities,
Laurin failed to adduce evidence that the asserted reason for her
discharge (i.e., "essential function") was pretextual, or that the
requested accommodation was denied due to any discriminatory
animus. See supra Section II.A. Thus, absent the requisite
showing that the grievance against the Hospital was meritorious,
the MNA had no corresponding duty to pursue the grievance. The
"hybrid" claim accordingly failed.
Affirmed.