Chanelle J. **TAYLOR**, Plaintiff,

v.

**HAMPTON ROADS REGIONAL JAIL AUTHORITY**, Defendant.

**Civil Action No. 2:07cv294.**

United States District Court,
E.D. Virginia,
Norfolk Division.

May 5, 2008.

Robert J. Haddad, Esquire, Andrew M. Hendrick, Esquire, Shuttleworth, Ruloff, Swain, et al., Virginia Beach, VA, for Chanelle J. Taylor.

Jeff W. Rosen, Esquire, Pender & Coward PC, Virginia Beach, VA, for Hampton Roads Regional Jail Authority.

## OPINION AND ORDER

WALTER D. KELLEY, JR., District Judge.

Plaintiff Chanelle Taylor, who was born without a right hand, alleges that the Hampton Roads Regional Jail Authority ("HRRJ") discriminated against her on the basis of her disability when it did not hire her as a corrections officer. She seeks monetary and injunctive relief pursuant to the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U.S.C. § 794. HRRJ has now moved for summary judgment. For the reasons set forth below, the Court **DENIES** HRRJ's Motion (Docket No. 7).

## I. Factual Background

On April 22, 2005, Ms. Taylor applied for the position of corrections officer at HRRJ. In August, HRRJ notified Ms. Taylor that it had selected her to proceed to the next round of the hiring process, which consisted of a written test and a physical agility test. The written test gauges an applicant's math and writing skills, and the physical agility test is "designed to simulate typical work related situations that require the ability to perform specific physical activities." (Docket No. 8, Ex. D at 2.) The agility test measures, in part, "how fast you can run a certain distance, . . . how fast you can drag a dummy over a certain distance, and . . . how fast you can fire the trigger of a gun in both hands." (Docket No. 8, Ex. C at 12.) Plaintiff successfully completed both tests, scoring a three out of ten possible points on the written portion and a seven out of ten on the agility portion.

During the next phase of the hiring process, Ms. Taylor passed a polygraph examination and received a perfect score from two jail officers who interviewed her to assess communication skills. In December, an HRRJ representative offered Ms. Taylor the corrections officer position. However, that offer was conditioned on Ms. Taylor passing the final stage of the screening process—the physical examination.[1]

---

1. In order to become a certified jail officer, Ms. Taylor also would have had to graduate from the Criminal Justice Academy within the first twelve months of her employment.

Prior to Ms. Taylor's physical examination, HRRJ Superintendent Roy Cherry learned that she did not have a right hand. He immediately instructed Milton Brooks, the Director of Human Resources for HRRJ, to forward the job requirements for the jail officer position to Ronald Jones, M.D., the outsourced physician designated to perform Plaintiff's physical. Among the listed requirements were "manual dexterity in both hands to restrain unruly individuals" and the "physical ability to administer CPR and handle firearms." (Docket No. 8, Ex. I at 7.) Superintendent Cherry intended "to make sure that Dr. Jones ... was aware of the fact that you needed to have two hands in order to perform the duties of a jail officer." (Docket No. 8, Ex. C at 36.)

Having been reminded of HRRJ's specifications, Dr. Jones deemed Ms. Taylor "not fit for duty" because she lacked manual dexterity in both hands. Ms. Taylor contends that Dr. Jones refused even to examine her once he learned that she lacked a right hand. On December 12, 2005, Ms. Taylor reported to work. Shortly after arriving, Mr. Brooks informed her that HRRJ would not hire her as a jail officer even though she had passed every test but the rigged physical exam.

## II. *Summary Judgment Principles*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once a motion for summary judgment is made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Hooven–Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir.2001) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Nevertheless, in reviewing the motion, a court must draw "all justifiable inferences" in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In cases where "there is reason to believe that the better course would be to proceed to a full trial," a court may deny summary judgment. *Id.*

## III. *Analysis*

■ The elements of a claim under the ADA and the Rehabilitation Act are the same. *Myers v. Hose,* 50 F.3d 278, 281 (4th Cir.1995); *Doe v. Univ. of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264 n. 8 (4th Cir.1995). To establish a *prima facie* case of discrimination under either statute, a plaintiff must prove: (1) she has a disability; (2) she is otherwise qualified for the position; and (3) her disability was a motivating factor in the employer's decision not to hire her. *Doe,* 50 F.3d at 1264–65; *see Baird v. Rose,* 192 F.3d 462, 470 (4th Cir.1999) (modifying *Doe's* articulation of third element).

With regard to the second element, a disabled plaintiff is otherwise qualified for the job if, "with or without reasonable accommodation, [she] can perform the essential functions of the employment position that [she] desires." 42 U.S.C. § 12111(8). However, the applicant is not otherwise qualified if she "pose[s] a direct threat to ... other individuals in the workplace." *Id.* § 12113(b). A " 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Id.* § 12111(3).

### A. *Is Plaintiff Disabled?*

■ Ms. Taylor has put forth evidence to create a genuine factual dispute as to whether she is disabled under the ADA. A disability is a "physical or mental impairment that substantially limits one or more ... major life activities." 29 C.F.R. § 1630.2(g)(1). Although HRRJ contends

that Ms. Taylor is not disabled because she does not regard herself as such, a plaintiff's "optimistic self-assessment … deserves little weight." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 22 (1st Cir.2002). The critical inquiry is "not whether a handicapped person accomplishes her goals, but whether she encounters significant handicap-related obstacles in doing so." *Id.*

Combing one's hair or cutting one's food, neither of which Ms. Taylor can perform by herself (Docket No. 14, Ex. B ¶ 4), are clearly "major life activities" as used in the ADA's companion regulations. *See* 29 C.F.R. § 1630.2(i) (listing "caring for oneself" and "performing manual tasks" as major life activities). A genuine issue of material fact therefore exists as to whether Ms. Taylor is disabled. *See Stillwell v. Kan. City, Mo. Bd. of Police Comm'rs*, 872 F.Supp. 682, 685 (W.D.Mo.1995) (finding plaintiff without a left hand disabled); *see also Ethridge v. Alabama*, 860 F.Supp. 808, 813 n. 10 (M.D.Ala.1994) (accepting defendant's concession that restricted use of right hand and arm resulting from vascular tumors is a disability); *Champ v. Balt. County*, 884 F.Supp. 991, 995 (D.Md. 1995) (same concession where plaintiff's left upper arm was useless).

### B. *Is Plaintiff Otherwise Qualified?*

Defendant likewise has failed to meet its burden on the second element. It seems counterintuitive to conclude that a one-handed person could perform the essential functions of a jail officer, but the ADA was intended to move society beyond stereotypes and into evidence of a disabled person's actual abilities. *See Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir.1997) ("[T]he ADA was designed to 'assure [ ] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps.'") (*quoting Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir.1986)), *abrogated on other grounds by Baird v. Rose*, 192 F.3d 462 (4th Cir.1999). Ms. Taylor has produced evidence that she can perform each essential function of a jail officer.[2]

To assess her ability to work as a corrections officer, Ms. Taylor hired T. Glenn Meadows, an expert in tactical defense training with approximately twenty-five years of law enforcement experience. Mr. Meadows led Plaintiff through a series of drills, each one related to an essential function.[3] He then drafted a detailed re-

---

**2.** In its Interrogatory Responses, HRRJ provided the following list of essential functions of a jail officer:

    1. Maintaining security of the facility;
    2. Serving meals to inmates through tray slots;
    3. Conducting regular pat down and cell and area searches for contraband;
    4. Controlling physical altercations between inmates or between inmates and staff; defending oneself and others;
    5. Administering first aid and CRP [sic] to inmates and staff and responding to medical emergencies;
    6. Using firearms when transporting inmates and responding to emergencies;
    7. Using security equipment including application of restraints;
    8. Restraining unruly individuals;

    9. Transporting inmates and ability to perform emergency driving;
    10. Must complete jailer training as required by the Virginia Department of Criminal Justice Services which includes completing defensive tactics training, weapons training and physical fitness training.

(Docket No. 14, Ex. O.)

**3.** Mr. Meadows assessed Ms. Taylor's ability to: (1) load and unload handgun magazines; (2) insert a loaded magazine into a handgun; (3) charge a semi-automatic handgun; (4) change magazines during sustained firing; (5) clear various types of weapon malfunctions; (6) fire while holding a flashlight; (7) positioning her firearm; (8) shoot off-handed (although HRRJ did not designate it as an es-

port summarizing Ms. Taylor's performance. Mr. Meadows opined in this report that Ms. Taylor can discharge all of the essential functions of a jail officer. Although Ms. Taylor may require accommodation to perform some aspects of the job, Mr. Meadows devised accommodations that appear reasonable. *See* 42 U.S.C. § 12111(9)(B) (including as a reasonable accommodation the "acquisition or modification of equipment or devices"); *see U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) ("[A] plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." (citations omitted)).

In contrast to the specific evidence advanced by Ms. Taylor, HRRJ offers nothing more than the generalized, conclusory statements of its employees. Granted, the position of corrections officer is an inherently risky one, as numerous defense witnesses suggested in their deposition testimony. However, none of those witnesses attempted to explain why Mr. Meadows's evaluation was inaccurate, implausible, or otherwise not indicative of on-the-job conditions. While Dr. Jones did find Plaintiff unfit for duty, he did not exercise his own judgment in arriving at that conclusion. Rather than evaluating whether Ms. Taylor was *actually* incapable of working as a jail officer, Dr. Jones simply served as Superintendent Cherry's proxy.

Nor can HRRJ meet its burden via precedent. The cases it cites, where courts have granted summary judgment for the defendants on ADA employment claims, are factually inapposite. In *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 483, 485 (7th Cir.1997), *Kees v. Wallenstein*, 161 F.3d 1196, 1198 (9th Cir.1998), *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir.2000), and *Johnson v. Maryland*, 940 F.Supp. 873, 878 (D.Md. 1996), the plaintiffs *admitted* that they were unable to perform certain facets of the job at issue. Thus, in those cases, the courts only needed to determine whether those facets constituted "essential functions," and if so, whether a reasonable accommodation would allow the plaintiffs to perform them. *See Miller*, 107 F.3d at 485–86; *Kees*, 161 F.3d at 1199; *Hoskins*, 227 F.3d at 728; *Johnson*, 940 F.Supp. at 878.

In *Ethridge*, 860 F.Supp. at 819, and *Champ*, 884 F.Supp. at 1000–01, *aff'd*, 91 F.3d 129 (4th Cir.1996) (unpublished table decision), the plaintiffs contended that they could perform all essential functions, but the defendants/employers submitted *hard* evidence to rebut the plaintiffs' claims. In *Ethridge*, 860 F.Supp. at 815, this hard evidence came in the form of a failed firearms test; in *Champ*, 884 F.Supp. at 995–96, it came in the form of a failed medical examination conducted by the employer's physician. Unlike those cases, the concrete evidence before the Court in this case—Mr. Meadows's report and the re-

---

sential function); (9) fire a shotgun; (10) handcuff prisoners; (11) conduct pat down searches; (12) execute basic law enforcement grasps and takedowns; and (13) use a knife in self-defense. (Docket No. 14, Ex. P–1.) Mr. Meadows did not test whether Plaintiff could serve meals to inmates, her ability to perform CPR, or her ability to drive.

However, it appears that Ms. Taylor would not necessarily need a right hand to serve meals. Marcus O'Neil, a jail officer at HRRJ,

testified that inmates pass the trays through the tray slots, so that a corrections officer need only unlock and open the slot. (Docket No. 8, Ex. L at 22–23.) Additionally, Ms. Taylor is certified in CPR. (Docket No. 14, Ex. A at 60–61.) During her deposition, Plaintiff also discussed her ability to drive and simultaneously talk on a two-way radio. (Docket No. 14, Ex. A at 96–97.) HRRJ has not contested the validity of her CPR certification or her ability to multitask while driving.

sults of Ms. Taylor's physical agility test [4] —militates in her favor.

Furthermore, HRRJ has not specified why the accommodations that Mr. Meadows proposes are unreasonable. *See* 42 U.S.C. § 12112(b)(5)(A) (rebutting reasonableness of accommodation requires showing by employer that adjustment would "impose an undue hardship on the operation of the business"); *Barnett*, 535 U.S. at 402, 122 S.Ct. 1516 ("Once the plaintiff has made [a] showing [of facial reasonableness], the defendant/employer then must show special ... circumstances that demonstrate undue hardship in the particular circumstances."). Again, HRRJ relies solely on generalities to support its position. For example, Moses Pollard, the Assistant Superintendent of HRRJ, offered this empty response when defense counsel asked him about accommodations:

> Q. Do you believe there are any accommodations the jail could make to someone in Ms. Taylor's condition that would allow her to complete these essential functions?
>
> A. No, sir, I do not.

(Docket No. 8, Ex. A at 29.)

Other witnesses took a closer look at the reasonableness of one possible accommodation—a prosthetic device. However, their assessments are irrelevant, because they still do not address the accommodations set forth in Mr. Meadows's report. None of these accommodations—charging a weapon against Ms. Taylor's shoe heel, placing her gun in her holster for reloading, using a shotgun sling, and handcuffing a prisoner before a pat down—involved the use of a prosthesis.

Finally, HRRJ argues that Ms. Taylor, if hired, would pose a direct threat to herself and her fellow employees. *See* 42 U.S.C. § 12113(b); 29 C.F.R. § 1630.2(r). The burden lies on the employer to show that the disabled employee would represent a direct threat. *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 188 (4th Cir.2002) (dictum); *see Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 764 (5th Cir.1996). *But see McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004) (holding that when job functions necessarily implicate others' safety, employee bears burden of showing she is not a direct threat). Section 1630.2(r) of Title 29 of the Code of Federal Regulations explains the manner in which an employer must establish this defense:

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would post a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

HRRJ does not address these factors; it instead offers only more generalizations. First, it asks the Court to accept Dr. Jones's after-the-fact rationalization. In explaining why he still would have found

---

**4.** Mr. Brooks insists that applicants do not need even a minimum score to proceed to the next phase of the hiring process. His explanation, however, implies that an applicant must at least *complete* the test. Plaintiff's completion of the test—not to mention her ability to score seven points out of ten on it—further indicates that she might be able to perform the essential functions of a corrections officer.

Plaintiff unfit for duty even if HRRJ had not faxed the job description to him, Dr. Jones opined:

> She's going to have to restrain prisoners. With only one hand I think she would be a danger to herself and she could get hurt. She could also be a danger to her co-workers, in that if she wasn't able to—oh, my goodness. I have had multiple cases where people that are big strong guys with two hands have been hurt by suspects. And I felt that it would be unsafe for her to work in that environment with one hand.

(Docket No. 8, Ex. I at 11.) Dr. Jones's testimony does not establish the direct threat defense, because he fails to provide any medical basis for his conclusion, and he does not discuss whether the safety concerns could be alleviated by reasonable accommodation. *See* 42 U.S.C. § 12111(4) ("The term 'direct threat' means a significant risk to the health or safety of others *that cannot be eliminated by reasonable accommodation.*" (emphasis added)). As a result, his *post hoc* justification is incomplete.

Second, HRRJ directs the Court to the deposition testimony of Lieutenant William Smith, the Director of Operations at HRRJ, and Superintendent Cherry. Both men believe Ms. Taylor, if employed by HRRJ, would place herself and her co-workers at risk of bodily harm. (Docket No. 8, Ex. M at 41; Docket No. 8, Ex. H ¶ 5.) However, neither explains *why* Plaintiff would present such a risk. Furthermore, like Dr. Jones, neither considered whether reasonable accommodation might ameliorate the alleged safety concerns.

### C. *Was Plaintiff's Disability a Motivating Factor in HRRJ's Decision Not to Hire Her?*

As already noted, Superintendent Cherry, via Mr. Brooks, informed Dr. Jones "of the fact that [Ms. Taylor] needed to have two hands in order to perform the duties of a jail officer." (Docket No. 8, Ex. C at 36.) This statement alone suffices to create a factual dispute as to whether Plaintiff's disability was a motivating factor in HRRJ's decision not to hire her. *See Baird,* 192 F.3d at 470 ("[I]f a plaintiff ... demonstrates that his or her disability played a motivating role in the employment decision, the plaintiff is entitled to relief.").

### IV. *Conclusion*

For the above reasons, the Court **DENIES** HRRJ's Motion for Summary Judgment (Docket No. 7).

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**