POSNER, Chief Judge.
 

 Bobbi Miller appeals from the grant of summary judgment to the Illinois Department of Corrections in her suit under the Americans With Disabilities Act, 42 U.S.C. §§ 12101
 
 et seq.
 
 916 F.Supp. 863 (C.D.Ill. 1996). In 1986 Miller was seriously injured in an automobile accident. She recovered, or at least appeared to have recovered, and in 1988 was hired as a correctional officer in a medium-security prison. Five years later, however, as a delayed consequence of the accident, she experienced a precipitous, and probably permanent, loss of vision in both eyes. She is not completely blind, but her vision is so poor (20/800 — meaning that an object that a person with normal vision could see from up to 800 feet away she cannot see if it is more than 20 feet away) that she requires a seeing-eye dog. She cannot see well enough to read, though it is possible that she could read a computer screen with the aid of the special technologies that computer manufacturers have developed to enable people with severely impaired vision to use computers. The prison officials discharged her from her job as a correctional officer on the ground that she was incapable of performing the duties of that position. Her suit seeks reinstatement and damages.
 

 We can set to one side the evidence, which in the posture of the ease we must accept as true whether it is or not, that the warden was motivated by an irrational hostility to blind persons. It is alleged that he stated flatly that he didn’t want a blind person working in his prison — he was afraid that “people would be tripping over the [seeing-eye] dog at all times” — and that in discussing the matter “he grew very agitated and informed us that there was no way a blind person would ever work in his Prison.” Employment decisions motivated by the distaste or even distress that severe physical or mental disabilities arouse in some people violate the ADA,
 
 Vande Zande v. Wisconsin Dept. of Administration,
 
 44 F.3d 538, 541 (7th Cir.1995), but we do not understand Miller to be arguing that if she can’t perform the job she seeks even with a reasonable accommodation to her disability on the part of the employer, she is nevertheless entitled to relief under the Act because of the improper motivation of one of the decision-makers.
 

 She is right not to argue this. Under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act, a plaintiff who proves that a discriminatory intent entered into the decision to fire him cannot recover damages, or obtain an order reinstating him, if the employer proves that he would have been fired anyway. 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B);
 
 Hennessy v. Pemil Datacomm Networks, Inc.,
 
 69 F.3d 1344, 1350 (7th Cir.1995). Under the ADA, the employer avoids all liability if the plaintiff would have been fired because incapable of performing the essential functions of the job, and the burden of proof on the issue of capability is not on the employer but on the plaintiff.
 
 Weiler v. Household Finance Corp.,
 
 101 F.3d 519, 524 (7th Cir. 1996);
 
 Bultemeyer v. Fort Wayne Communi
 
 
 *-1099
 

 ty Schools,
 
 100 F.3d 1281, 1284 (7th Cir. 1996). For the provisions of the ADA relating to employment protect only a “qualified individual,’’ 42 U.S.C. § 12112, one who with or without a reasonable accommodation by the employer can perform the essential functions of the job. § 12111(8). See, e.g.,
 
 Moses v. American Nonwovens, Inc.,
 
 97 F.3d 446, 448 (11th Cir.1996) (per curiam). The warden may have fired Miller for an improper purpose, but if she can’t perform the essential functions of her job, so that she would have been fired anyway, there has been no violation of the Act and she has no right to relief.
 

 This is clearly the situation with regard to Miller’s desire to retain her job as a correctional officer. The Department of Corrections has specified a long list of duties that correctional officers are required to perform — including standing guard, counting inmates, inspecting for contraband, escorting inmates outside their cells, searching inmates and visitors, searching for escaped prisoners, and being on 24r-hour call to respond to emergencies, such as riots and escapes — and that Miller concedes she can’t perform, because of her blindness. The only specified duties of a correctional officer that she might be able to perform, though it would require special equipment (but that might be within the scope of the employer’s duty of reasonable accommodation), would be as a telephone switchboard operator or as an armory officer, where she would be in charge of issuing guns to correctional officers as needed. Normally, correctional officers rotate through the various duty positions. Miller could not do this, but she argues that she should be excused from performing the duties that she cannot perform and limited to the ones she can. So she would just rotate between the switchboard and armory positions.
 

 But it seems to us, as it seemed to the district court (there is no case exactly on point), that if an employer has a legitimate reason for specifying multiple duties for a particular job classification, duties the occupant of the position is expected to rotate through, a disabled employee will not be qualified for the position unless he can perform enough of - these duties to enable a judgment that he can perform its
 
 essential
 
 duties. See
 
 Allison v. Department of Corrections,
 
 94 F.3d 494, 498-99 (8th Cir.1996);
 
 Simon v. St Louis County,
 
 735 F.2d 1082, 1084-85 (8th Cir.1984). If it is reasonable for a farmer to require each of his farmhands to be able to drive a tractor, clean out the stables, bale the hay, and watch the sheep, a farmhand incapable of performing any of these tasks except the lightest one (watching the sheep) is not able to perform the essential duties of his position. This is provided that the employer has a valid reason for requiring multiple abilities. In the case of the farmhand, the reason would be that the farm was too small to justify the hiring of specialists in each task. In the ease of correctional officers and other paramilitary and military personnel, the reason for having multiply able workers who rotate through the different duty positions is to be able to respond to unexpected surges in the demand for particular abilities. The prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have experience in the positions, such as searching and escorting inmates, that provide the necessary training and experience for responding effectively to a riot, as well as the capability for such response. It would not do to have a correctional officer whose only experience and capability were in operating a telephone switchboard or issuing weapons. All this is obvious enough, was attested to in evidentiary materials submitted in the district court, and is not seriously disputed by the plaintiff on the level of fact, though she disagrees with the inference that she is unable to perform the essential duties of a correctional officer.
 

 The more difficult issue is whether Miller should have been offered another job in the prison (or perhaps in another prison operated by the Department). Correctional officer is only one job classification in the prison. The prison employs cooks, dieticians, secretaries, receptionists, data processors, and other sendee personnel who are not required to be able to assist in the physical control of the inmate population. Many, perhaps all, of these are jobs that a blind person can fill if
 
 *-1098
 
 the employer makes a reasonable accommodation to the person’s blindness. See J. Elton Moore, “Blindness and Vision Disorders,” in
 
 Encyclopedia of Disability and Rehabilitation
 
 115, 119 (Arthur E. Dell Orto
 
 &
 
 Robert P. Marinelli eds. 1995); Joseph J. Lazza-ro, “Computer Applications for Persons With Visual Impairments,” in
 
 id.
 
 at 197. What makes the issue of Miller’s exclusion from these other jobs difficult is the profound uncertainty about whether she
 
 has
 
 been excluded from them. In her correspondence and discussions with the prison officials she said she wanted to be a correctional officer. She acknowledged her inability to perform all the duties of the position and asked that it be restructured so that she would be required to perform only those duties that she can perform. She did say she’d told the warden that she “would even be willing to take the officer’s uniform off as long as I could be assigned to a position within the facility
 
 that would be appropriate for my professional experience and background)”
 
 and that she would “take any position at Graham [the name of the prison] or another facility with the Department that would be appropriate for my level of experience and my talents
 
 ... as long as such a position came with comparable pay,”
 
 but the portions of these statements that we have italicized imply that she wants the status and pay of a correctional officer without having to perform the full range of duties of the job. She wants an altered correctional-officer job classification.
 

 When Miller lost her job at Graham, the state offered her, and she took, a job as a residential care worker at a state school for the visually impaired. She describes the job as a demotion because she took “a severe cut in pay.” So far as appears, the jobs in the prison for which she is qualified also pay much less than a correctional officer’s job. In general, there is a wage premium for dangerous and distasteful jobs, such as being a prison guard. Adam Smith noticed this more than two centuries ago (1
 
 The Wealth of Nations
 
 116-17, 121 (R.H. Campbell & A.S. Skinner eds. 1976) [1776]), and there is plenty of modern empirical confirmation. See, e.g., Craig A. Olson, “An Analysis of Wage Differentials Received by Workers on Dangerous Jobs,” 16
 
 J. Human Resources
 
 167 (1981); W. Kip Viscusi,
 
 Risk by Choice: Regulating Health and Safety in the Workplace
 
 (1983), esp. ch. 3; Jean-Michel Cousi-neau, Robert Lacroix, & Anne-Marie Girard, “Occupational Hazard and Wage Compensating Differentials,” 74
 
 Rev.Econ. & Stat.
 
 166 (1992); W. Kip Viscusi, “The Value of Risks to Life and Health,” 31
 
 J.Econ.Lit.
 
 1912, 1931-35 (1993). It is precisely the dangerous and distasteful aspects of a prison guard’s job, such as searching prisoners’ body cavities and breaking up fights among inmates, that Miller, through no. fault of her own, is incapable of performing. We do not understand her to be arguing that she seeks as an alternative to the job of correctional officer a nonTcorrectional-officer’s job, at a non-corree-tional-offieer’s salary, in the prison that is comparable to her job at the institute for the blind — a job, in other words, that she is qualified to perform. Until she applies for such a job, a suit complaining about the prison’s refusal to give it to her is premature.
 

 In so ruling, we are mindful that the duty of reasonable accommodation requires more than a willingness on the part of the employer to listen to the employee’s suggestions as to how the workplace might at reasonable cost be adapted to the employee’s disability. The employer will often know more about the feasibility of such adaptations than the employee, so if the employee requests accommodation the employer must make a reasonable effort to explore the possibilities.
 
 Bultemeyer v. Fort Wayne Community Schools, supra,
 
 100 F.3d at 1285;
 
 Taylor v. Principal Financial Group, Inc.,
 
 93 F.3d 155, 165 (5th Cir.1996). If, moreover, the nature of the disability is such as to impair the employee’s ability to communicate his or her needs, as will sometimes be the case with mental disabilities, the employer, provided of course that he is on notice that the employee
 
 has
 
 a disability, has to make a reasonable effort to understand what those needs are even if they are not clearly communicated to him.
 
 Bultemeyer v. Fort Wayne Community Schools, supra,
 
 100 F.3d at 1285-87;
 
 Hunt-Golliday v. Metropolitan Water Reclamation District,
 
 104 F.3d 1004, 1013-14 (7th Cir.1997). Even if an employee
 
 *-1097
 
 who as here becomes disabled while employed just says to the employer, “I want to keep working for you — do you have any suggestions?” the employer has a duty under the Act to ascertain whether he has some job that the employee might be able to fill. 42 U.S.C. § 12111(9)(B);
 
 Cochrum v. Old Ben Coal Co.,
 
 102 F.3d 908, 913 (7th Cir.1996);
 
 Gile v. United Airlines, Inc.,
 
 95 F.3d 492, 496-99 (7th Cir.1996);
 
 Benson v. Northwest Airlines, Inc.,
 
 62 F.3d 1108, 1114 (8th Cir. 1995).
 

 Miller’s counsel has tried in this court to east her case in that mold, arguing that she would have taken any job so long as she could stay at Graham. But the statements of hers that we have quoted and much else that we could quote paint a different picture. She wanted to remain at Graham on her own terms, and those terms involved her remaining, with or without the uniform, in the same job status that she had occupied before she became disabled. That is the job status that she is
 
 not
 
 qualified for under the disability law because she cannot perform its essential duties. She evinced no interest in prison jobs not occupied by correctional officers, jobs the essential duties of which may be within her ability to perform. She thus did not put the prison on notice to search out such jobs in order to determine whether there was one that she might fill.
 

 We are
 
 still
 
 not at all sure that she wants to be anything less at Graham than a correctional officer; but if she does, it is not too late for her to apply. If you reapply for the same job that you were recently turned down for, and are again rejected, a new suit complaining about the second rejection is barred by the principle of collateral estoppel. Cf.
 
 Kennedy v. Chemical Waste Management, Inc.,
 
 79 F.3d 49, 51 (7th Cir.1996);
 
 Graehling v. Village of Lombard,
 
 58 F.3d 295 296-97 (7th Cir.1995);
 
 Webb v. Indiana Nat’l Bank,
 
 931 F.2d 434, 436 (7th Cir.1991). There is no such bar if you are applying for a different job involving different qualifications. Miller can follow that course if she really wants to work at Graham other than in the correctional officer’s position from which, unfortunately, her disability disqualifies her.
 

 AFFIRMED.