In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-1582

PAUL BARROWS,

*Plaintiff-Appellant*,

*v.*

JOHN WILEY and LUOLUO HONG,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05 C 658—**John C. Shabaz**, *Judge*.

———————

ARGUED SEPTEMBER 27, 2006—DECIDED FEBRUARY 22, 2007

———————

Before POSNER, MANION, and WOOD, *Circuit Judges.*

MANION, *Circuit Judge.* Paul Barrows filed a com-
plaint pursuant to 42 U.S.C. § 1983 against his employer,
the University of Wisconsin-Madison ("University"), al-
leging that the University violated his Fourteenth
Amendment right to due process by placing him on
unpaid administrative leave and forcing him to use
various types of leave time to obtain compensation. The
district court granted the University summary judg-
ment. Barrows appeals, and we affirm.

I.

The University employed Paul Barrows beginning in 1989. Barrows served in various academic capacities during his employment with the University. Academic staff may serve in "indefinite" or "limited" appointments. An "indefinite appointment is an appointment with permanent status and for an unlimited term, granted by the chancellor to a member of the academic staff. Such an appointment is terminable only for cause under ch. UWS 11 or for reasons of budget or program under ch. UWS 12." Wis. Admin. Code UWS § 10.03(2)(b). A limited appointment is "a special appointment to a designated administrative position." Wis. Admin. Code UWS § 15.01(1). A person who serves in a limited appointment does so at the "pleasure of the authorized official who made the appointment." *Id.* Additionally, an employee with an indefinite appointment can also hold a limited appointment. Moreover, the limited appointment does not impact any rights due an individual holding an indefinite appointment. *Id.* Thus, for those serving in a limited appointment who have also received an indefinite appointment, the indefinite appointment remains as a backup position which they may assume at the expiration of their limited appointment. A "backup" position or appointment is another name for an indefinite appointment. In 1997, Barrows received an appointment to a full-time position in the Provost's Office (which was designated as an indefinite backup position). In July 2000, Barrows accepted a limited appointment as Vice Chancellor for Student Affairs, receiving an annual salary of $191,749.00 and reporting to John Wiley, Chancellor of the University. For the next several years, Barrows was apparently successful in performing his assigned duties.

On or before November 1, 2004, however, while at an assembly for a University project, Wiley abruptly asked Barrows to step down from his position as Vice Chancellor.[1] Wiley directed Barrows to submit a letter of resignation, which he reluctantly did. In a letter dated November 1, 2004, Barrows stated that he was stepping down from his position as Vice Chancellor for Student Affairs, explaining that "[w]ith recent changes in my family situation, and the stress those bring, I am propos- ing to take some personal leave time." In a response letter dated November 2, 2004, Wiley accepted Barrows's resignation and stated that he would schedule a time to speak with Barrows, but recommended as a short-term proposal that Barrows "take leave as necessary to address [his] personal issues." Wiley indicated that after his leave, Barrows could complete a fund-raising project and begin a feasibility study, and after the completion of the latter project speak with Provost Spears if he was interested in "additional roles at UW-Madison." If he was interested in such a position, it would qualify as part of his academic staff backup appointment. Barrows, though, later asserted in an affidavit signed January 3, 2006, that he did not resign from his position, but rather that Wiley fired him. In the meantime, regardless of the subsequent characterization, Barrows went on leave from November 2004 through June 20, 2005. During this time, by using vacation leave,

---

[1] There were allegations that Barrows, who was married with two children, had a relationship with a graduate student, which prompted Wiley's request. Additional allegations of improper behavior prompted Barrows's paid leave of absence in June 2005 and a subsequent investigation. These circum- stances are not pertinent to our deliberations apart from the fact that they precipitated the actions at issue here.

sick leave, and leave in his Annual Leave Reserve Account ("ALRA"), Barrows continued to be compensated at the annual rate of pay he received as Vice Chancellor for Student Affairs ($191,749.00). Specifically, during that time, Barrows received $124,140.18 in gross wages through the use of 524 hours of sick leave, 186 hours of vacation time, and 124 hours of ALRA leave. Then, from June 20, 2005, through June 23, 2005, Barrows worked as a consultant at the University. On June 23, 2005, Barrows was placed in his backup position at the Provost's Office with an annual salary of $72,881.00. That same day, Barrows was placed on paid administrative leave.

Barrows responded by filing a complaint in the district court pursuant to 42 U.S.C. § 1983, asserting that he had a right to immediate placement in his backup position when he was "terminated" in November 2004. He claimed that forcing him to use his vacation leave, ALRA leave, and sick time without notice or opportunity to be heard violated his right to due process. The district court granted the defendants' motion for summary judgment, concluding that Barrows had failed to establish that the University caused him economic harm and that Wiley was entitled to qualified immunity. Barrows appeals.[2]

---

[2] Barrows also brought a state claim against defendant Luoluo Hong, Dean of Students at the University of Wisconsin-Madison, over which the district court declined to exercise supplemental jurisdiction after it granted Wiley's motion for summary judgment on qualified immunity grounds. Because Barrows's claim against Hong is not raised in his appeal, we need not address it.

II.

A district court's grant of summary judgment is reviewed de novo. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006). Barrows's constitutional claim is premised on a denial of procedural due process. Specifically, he alleges that he was denied a property right by being required to use leave time, whether sick, vacation, or ALRA, between November 2004 and June 20, 2005, as opposed to being immediately placed in his backup position.

"Procedural due process claims require a two-step analysis. The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." *Luellen v. City of E. Chicago*, 350 F.3d 604, 613 (7th Cir. 2003) (quoting *Strasburger v. Bd. of Educ., Hardin County Comm. Unit Sch. Dist. No. 1*, 143 F.3d 351, 358 (7th Cir. 1998)). In other words, the plaintiff must have a protected property interest in that which he claims to have been denied without due process. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).

Ascertaining "whether a particular job action against a public employee implicates a constitutionally protected property interest is a question of law; '[p]roperty interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005) (quoting *Loudermill*, 470 U.S. at 538). Those property interests may also be created by contract with a state entity. *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 700 (7th Cir. 2001). "A mere opportunity to acquire property, however, does not itself qualify as a property interest protected by the Constitution." *Head v. Chicago Sch. Reform Bd. of Tr.*, 225 F.3d 794, 802 (7th Cir.

2000) (citations omitted). Losing the opportunity to acquire property does not constitute a deprivation. *Kyle v. Morton High Sch.*, 144 F.3d 448, 452 (7th Cir. 1998). Conversely, "[p]eople have a legitimate claim of entitlement to keep that which presently securely belongs to them. Where state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Cornelius v. LaCroix*, 838 F.2d 207, 210 (7th Cir. 1988).

Further, "to recover for a deprivation of a property interest, [a plaintiff] must show some economic loss from the [state's] action, or at least an identifiable impact on his future income or economic benefits." *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 530 (7th Cir. 2000). Purely dignitary and non-pecuniary interests, such as professional satisfaction, personal relationships, and reputation, do not constitute property. *Id.* "[A] job action that causes no pecuniary loss whatsoever does not implicate the Constitution." *Deen*, 414 F.3d at 734 (citations omitted). *See also Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993).

The first step of the due process analysis requires us to consider initially whether Barrows had property interests in his backup position and leave time, and secondarily whether he suffered economic harm from a property deprivation. As the parties seem to agree that Barrows had a right to assume his backup position, the question is at what point the University was obligated to place him in that position. The *University of Wisconsin System Unclassified Personnel Guidelines* § 3.02 provides that "[s]hould a limited appointee with a faculty or academic staff backup appointment be terminated from the limited position, the appointee has no minimum notice

rights. However, the appointee has the right to assume the backup position without separation in service." The *Guidelines* do not define what constitutes "separation in service." Section 3.02 also provides that if a limited appointee resigns from the limited appointment and requests to return to his permanent appointment, "[s]uch requests should be honored as soon as possible by the authorized official. However, in the event a position is not readily available, or with the agreement of the limited appointee the authorized official may place the limited appointee on leave of absence until a vacancy becomes available." *Id.*

While it is clear that Barrows had a right to assume his backup position, that right was not "immediate," as he has characterized it, but only "without separation in service" in the case of termination, or upon his request to return to his permanent appointment, in the case of resignation. *See Guideline* § 3.02. Thus, if Barrows was terminated, he had "the right to assume the backup position without separation in service." *UW Personnel Guideline* § 3.02. In this case, however, the record does not support Barrows's claim that he was terminated; an individual who is terminated does not continue to receive compensation from his employer, as Barrows did at the annual rate of nearly $200,000. Moreover, there was no separation between Barrows and the University because, although he was placed on unpaid administrative leave, he continued to receive compensation through the use of his leave time.

As stated above, the *Guidelines* also afford the right to placement in a backup position upon the resignation from a limited appointment and a request for placement in the backup position. *See Guideline* § 3.02. There is no evidence in the record that Barrows requested to be

placed in his backup position or challenged the University's failure to immediately place him in his backup position. Although Barrows asserted in his affidavit that he sought to return to work, this generalized statement is insufficient to establish that he sought his backup position.

Moreover, Barrows failed to assert economic harm flowing from the University's decision not to immediately place him in his backup position. As noted, while he was on leave Barrows continued to receive compensation at the Vice Chancellor rate of pay of $191,749.00 annually, as opposed to the rate of pay for his backup appointment, $72,881.00. Thus, as opposed to an economic harm, Barrows seemingly benefitted by cashing in on his various leave categories.

Barrows argues in response that he suffered an economic harm by being forced to use his leave time, including sick, ALRA, and vacation time. In support of his position, Barrows cites several University policies that allow for employees to receive compensation for unused sick, ALRA, and vacation time after they leave the University's employ. Barrows then argues that by forcing him to use this leave time, rather than placing him in the backup position, the University deprived him of the extra compensation he would have received after he left the backup position.

The problem with Barrows's argument is that he did not present sufficient evidence of an economic harm because he failed to provide an adequate loss calculation. In his affidavit filed with the district court, Barrows set forth the number of hours of leave that he used from November 1, 2004, through June 20, 2005, calculating each at the hourly rate of his Vice Chancellor position.

He concluded that he lost a total of $171,589.48 as a result of the loss of his vacation, ALRA, sick leave, salary, and supplemental health insurance conversion credit. There are several deficiencies in this amplified calculation. First, Barrows did not take into account the salary differential between the two positions. The University paid Barrows for leave at his Vice Chancellor rate of pay, which was about two and one-half times higher than the salary paid in the backup position. Barrows failed to cite to anything in the record that would establish that upon leaving his backup position, he would be paid for unused ALRA or vacation leave time at the higher Vice Chancellor rate of pay, as opposed to at the rate of pay he would have earned in the backup position. Second, Barrows failed to account for the time value of money. Leave pay paid in 2004 and 2005 is worth more than the same money paid in the future. Third, Barrows did not take into account the probability that he would have used some of the leave time at issue before his retirement. Fourth, Barrows did not address or incorporate into his loss assessment the possibility that he may leave the University system before retirement at age fifty-five.[3] Finally, Barrows failed to incorporate into his analysis the caps and other restrictions on the usage of various leave time. *See id; UW Personnel Guidelines* § 9.03 (providing, in part, that "[u]nused vacation may be carried over

---

[3] *See* The University Wisconsin-Madison, Business Services Sick Leave Conversion Credit Program, http://www.bussvc.wisc. edu/ecbs/lev-aslcc-shicc-information-chart-uw1048.html (last visited February 8, 2007) (setting forth requirements for participation in sick leave conversion program; individuals who terminate their employment with the University with less than twenty years of service are not eligible for that program).

to the next fiscal year for up to one year after the year
in which it accrues. . . . The institution, after sufficient
notice, may require annual pay basis staff to use all accrued
vacation, personal holidays, floating holidays and leave
accumulated in the Annual Leave Reserve Account prior
to retirement, layoff or termination without cause or for-
feit any unused leave balance.").

The district court recognized these deficiencies, and aptly
stated:

> Where plaintiff had provided a competently computed
> present value figure of the lost credit toward his
> insurance premiums he would then have to show
> that figure was greater than the $76,969.75 difference
> between the gross wages he received ($124,140.18) from
> November 2004 through June 23, 2005 and the gross
> wages he would have received in his back up position
> ($47,170.23). Since plaintiff has not made this showing,
> he has not demonstrated that he suffered any economic
> harm.

*Barrows v. Wiley*, No. 05-C-658-S, 2006 WL 167452, at *3
(W.D.Wis., Jan 23, 2006). In light of the aforementioned
deficiencies, Barrows has not established that he suffered
economic harm through the use of his leave time. *See
Bordelon*, 233 F.3d at 531.

Barrows counters that under *Swick v. City of Chicago*,
11 F.3d 85 (7th Cir. 1993), the loss of his leave time was
"great economic harm," and, thus, a property interest.
Barrows's reliance on *Swick* is misplaced. In *Swick*, we
held that a police officer who was placed on involuntary
sick leave without salary, but received the same amount
of money in the form of sick pay, was not denied
due process because he was not suspended and did not
suffer a pecuniary loss in the loss of his badge or other

authority. *Swick*, 11 F.3d at 86. In dicta we stated that "[w]e can imagine a case in which a period of forced inactivity impeded promotional opportunities or had other indirect effects on post-retirement income." *Id.* Not only is this passage from *Swick* dicta that is not controlling, *see Atterberry v. Sherman*, 453 F.3d 823, 828 (7th Cir. 2006), but we certainly cannot rely on our imagination to make a case that the plaintiff did not prove. As emphasized above, in this case, Barrows failed to present sufficient evidence of an economic harm on his post-retirement or post-termination income. Accordingly, the district court properly granted the University and Wiley summary judgment.

### III.

Barrows failed to establish either a property interest or an economic harm flowing from the University's decision not to immediately place Barrows in his backup position, and instead having him use his sick, vacation, and ALRA leave time for compensation. Accordingly, Barrows's due process claim fails, and the district court properly granted the defendants summary judgment. We AFFIRM.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*