In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 05-2575

LIUTAURAS DARGIS,

*Plaintiff-Appellant*,

*v.*

MICHAEL F. SHEAHAN, Sheriff of Cook County,
a/k/a and d/b/a Cook County Sheriff's Office
of Corrections, MARCUS LYLES, Sheriff's Assistant
Executive Director of the Cook County Sheriff's
Office of Corrections, ERNESTO VELASCO, Executive
Director of the Cook County Sheriff's Office
of Corrections, et al.,

*Defendants-Appellees.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 6872—**Rebecca R. Pallmeyer**, *Judge*.

————————

ARGUED NOVEMBER 9, 2007—DECIDED MAY 16, 2008

————————

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Beginning in 1982, Liutauras
Dargis was employed as a correctional officer with the
Cook County Sheriff's Office. In February 2000, Dargis
suffered a stroke while on duty. When Dargis attempted
to return to work in July 2001, the Sheriff's Office declined

to reinstate him due to physical restrictions imposed by Dargis's physician, placing him instead on leave without pay. After exhausting his administrative remedies, Dargis filed suit in federal court against the Cook County Sheriff's Office, Cook County Sheriff Michael Sheahan, Assistant Executive Director Marcus Lyles, Executive Director Ernesto Velasco, and Cook County.[1] Dargis alleged, in pertinent part, that the Sheriff's Office violated his due process rights by not providing him with a hearing prior to placing him on leave, and violated the Americans with Disabilities Act ("ADA") by failing to reinstate him following his stroke. The Sheriff's Office moved for summary judgment on all claims. The district court denied the motion on the issue of due process, entering judgment instead for Dargis on those claims, and directing the Sheriff's Office to hold a hearing on Dargis's employment status within thirty days. The motion was granted as to Dargis's ADA claims, and Dargis's remaining claims, all based in state law, were dismissed due to the district court's decision not to exercise supplemental jurisdiction over them. Dargis now appeals, arguing that the district court erred by not proceeding to trial on the damages he sustained as a result of the due process violation, and by entering summary judgment against him on his ADA claims. Additionally, Dargis argues that the district court erred by not exercising supplemental jurisdiction over his state law claims and by denying a post-judgment motion to alter or amend the judgment. We affirm the district court.

---

[1] We hereafter refer to the Defendants collectively as the "Sheriff's Office."

I.

Dargis earned a Bachelor of Arts in Criminal Justice from the University of Illinois in 1981, and became a correctional officer with the Sheriff's Office on May 1, 1982. By all accounts, Dargis gave exemplary service and at the time of the events giving rise to this suit, he had risen to rank of Sergeant having supervisory authority over seventy-five other officers. On February 9, 2000, Dargis suffered a stroke while on duty. This stroke resulted in Dargis's hospitalization, and he was placed on short-term disability leave by the Sheriff's Office. Dargis remained on disability leave for over a year.

On June 28, 2001, Dargis's physician, Dr. Margaret Wade, provided him with a letter setting forth numerous medical conditions from which he suffered. In addition to listing his status as post-Cerebral Vascular Accident (stroke), Dr. Wade indicated that Dargis suffered from Type 1 Diabetes, Coronary Artery Disease, Chronic Myofacial Pain Syndrome, Bilateral Retinopathy, Vitreous Hemorrhages, Peripheral Vascular Disease, and a Neuropathic Bladder. Dr. Wade stated her belief that Dargis could return to work as of July 2, 2001, subject to the following limitations: (1) no physical contact,[2] (2) no physical activity other than sitting in a chair with brief episodes of standing and walking, (3) no lifting, kneeling, stooping, or running, and (4) a work environment with adequate heat and air conditioning. Before the date of his return, Dargis claims to have been told by an Assistant Executive Director of the Sheriff's Office,

---

[2] While not clear from the letter, the parties are in agreement that this restriction means no physical contact with inmates.

John Maul, that he would be placed in a position re-
quiring no contact with inmates upon his return.[3] Upon
returning to work on July 2, 2001, Dargis met with his
supervisor, Assistant Executive Director Marcus Lyles,
and presented him with the letter from Dr. Wade. Dargis
also clarified for Lyles that not having any inmate con-
tact was necessary because a blow to his head might
result in blindness or other serious medical problems.
Believing that Dargis could no longer perform the essen-
tial functions of a correctional officer, Lyles made the
decision not to return him to work.

The parties dispute whether positions exist within the
Sheriff's Office that do not require inmate contact. In an
affidavit submitted in support of the Sheriff's Office's
summary judgment motion, Lyles stated that correc-
tional officers are primarily responsible for maintaining
vigil, standing guard, counting inmates, breaking up
fights among inmates, inspecting for contraband,
escorting inmates outside their cells, searching inmates
and visitors, and searching for escaped inmates. Lyles
conceded that there are some positions requiring less
inmate contact than others, but asserted that all officers,
regardless of the position to which they were assigned,
must be able to respond to emergencies such as riots or
escapes, and must be able to rotate through various
positions as needed. This requirement, often occurring
due to unforeseeable events, meant that the Sheriff's
Office was unable to guarantee that any assignment
would shield an officer from all inmate contact.

Lyles's description of the range of duties for which a
correctional officer is responsible is confirmed by the

---

[3] There is no statement by Maul contained in the record.

Correctional Officer Job Description provided by Cook County's Position Classification Agency and submitted at the summary judgment stage by Dargis. The Job Description sets forth a correctional officer's duties as follows:

> Observes and supervises the behavior of inmates confined to Cook County's Correctional Institutions. Enforces rules and regulations established for the maintenance of order, discipline and safety. Makes rounds of assigned area to insure that all security procedures are adhered to and all inmates under surveillance are accounted for. Communicates with inmates to ascertain attitudes, problems and rehabilitation. Performs a variety of other related duties to assist with jail operations.

The Job Description also lists certain desirable qualifications a correctional officer should exhibit, including "[c]onsiderable good judgment and initiative . . . to assure prompt and thorough action during routine and emergency situations," and the "[a]bility to supervise and control inmate crews." The Job Description as filed had attached seventeen descriptions of specific positions and duties.

In his affidavit submitted in opposition to the motion for summary judgment, Dargis stated that he had performed all seventeen positions attached to the County's Job Description, and conceded that the majority of them involve contact with inmates. Dargis asserted, however, that there were a number of assignments not requiring any inmate contact, including the prison's tower, the master control security center, various points of entrance to and egress from the prison, the records department, the training academy, the computer room, and the firing range. Dargis claims that he repeatedly requested of

Lyles to be placed in one of these positions, believing that such placement would accommodate the limitations imposed by Dr. Wade,[4] but that his requests were ignored. Additionally, Dargis requested a hearing on Lyles's decision, but this request was denied. Dargis was instead placed on what the parties refer to as "zero pay status." Specifically, he was not terminated, which would have necessitated the filing of a charge with the Cook County Sheriff's Merit Board and a subsequent hearing. *See* 55 ILCS 5/3-7012. Instead, Dargis remained officially in the employ of the Sheriff's Office, however, he received no pay and had no recourse to a hearing.

On November 29, 2001, Dargis filed charges of discrimination with both the Illinois Department of Human Rights and the United States Equal Employment Opportunity Commission, and he received a right to sue letter on June 28, 2002. Dargis initiated this action in the district court on September 26, 2002. On April 4, 2003, he filed an Amended Complaint stating claims for violation of the ADA, violation of the Civil Rights Act of 1964 and the Due Process Clause of the Constitution pursuant to 42 U.S.C. § 1983, constitutional violations resulting from an alleged constructive discharge pursuant to 42 U.S.C. § 1983, conspiracy to violate the ADA and Dargis's civil

---

[4] The number and nature of Dargis's requests to Lyles are unclear because there is no documentation of them in the record save Dargis's statement in his affidavit that they were made. The only request contained in the record was made to Maul on Dargis's behalf by the American Federation of State, County and Municipal Employees asking that he be allowed to return to work, and be considered specifically for an assignment to the "Record Office, 7-3 Shift."

rights pursuant to 42 U.S.C. §§ 1983 and 1985, and eight state law claims arising from the Illinois Constitution, statutes, and common law. The Sheriff's Office moved for summary judgment on all of Dargis's claims on March 29, 2004. On March 25, 2005, the district court entered an order concluding that the Sheriff's Office had violated Dargis's due process rights as protected by federal and state law. Specifically, the district court found that the "[Sheriff's Office's] placement of [Dargis] on 'zero pay status' and refusal to return him to active duty constitutes a deprivation of a protected property interest, despite the fact that [Dargis] technically remains an employee of the Department of Corrections." The district court concluded that Dargis was entitled to a hearing before imposition of this deprivation, and the Sheriff's Office was directed to conduct a hearing within thirty days of the judgment pursuant to 55 ILCS 5/3-7012. Summary judgment was entered in favor of the Sheriff's Office on Dargis's remaining federal claims, and the remaining state claims were dismissed without prejudice when the district court declined to exercise supplemental jurisdiction over them. Dargis filed a motion to alter or amend the judgment, asserting that the district court had overlooked evidence relevant to his ADA claims. Dargis also claimed that the district court was required to proceed to trial to determine the damages he suffered as a result of the due process violation. This motion was denied on April 27, 2005.

Dargis raises four issues in his appeal. First, Dargis argues that there existed genuine issues of material fact which should have prevented the district court from entering summary judgment against him on his ADA claims. Second, although judgment was entered in his

favor on his due process claims, Dargis argues that the district court erred by directing the Sheriff's Office to hold a hearing instead of proceeding to trial on his claim for damages, attorney's fees and other appropriate relief. Third, Dargis asserts that the district court abused its discretion in dismissing his state law claims. Finally, Dargis claims that the district court erred when it denied his motion to alter or amend the judgment against him. The Sheriff's Office maintains that no error was committed by the district court.

## II.

### A. ADA Claim

We review a district court's grant of summary judgment de novo, and draw all inferences in favor of the nonmoving party. *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977 (7th Cir. 2008). Though given the benefit of this well-known standard, "[t]o survive summary judgment, the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Dargis claims that by failing to accommodate him after his stroke, the Sheriff's Office violated the ADA's mandate that it not "discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a). To make out a prima facie case of disability discrimination, Dargis must establish that (1) he suffers from a disability as defined in the ADA, (2) he is qualified to perform the essential functions of the job in question, with or without reasonable accommodation, and (3) he has suffered an

adverse employment action as a result of his disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). The Sheriff's Office asserts that Dargis cannot establish the second element of this test, namely, that he is qualified to perform the essential functions of a correctional officer, whether reasonably accommodated or not.

There are two requirements Dargis must meet to show that, though disabled, he is qualified to perform the essential functions of a correctional officer. He must (1) "satisfy 'the requisite skill, experience, education and other job-related requirements of the employment position [he] holds or desires,'" and (2) "establish that he 'can perform the essential functions of such position' with or without accommodation." *Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998) (quoting 29 C.F.R. § 1630.2(m)). There is no dispute that Dargis satisfies the first requirement—after receiving a degree in criminal justice in 1981, he served admirably as a correctional officer for almost twenty years before his stroke. The Sheriff's Office argues, however, that Dargis can no longer perform the essential functions of a correctional officer. Indeed, Dargis admitted during his deposition that he cannot stand watch over the inmates, break up fights, inspect cells, escort inmates when they are out of their cells, or search for escaped inmates. Notwithstanding these inabilities, Dargis asserts that he can still perform the essential functions of a correctional officer if he is assigned to a position requiring no inmate contact, including the prison's entrances and exits, tower, control center, records department, computer room, or firing range.

In *Miller v. Illinois Department of Corrections*, 107 F.3d 483 (7th Cir. 1997), we considered whether a correctional

officer with the Illinois Department of Corrections re-
mained able to perform the essential functions of a cor-
rectional officer after she went blind. Like Dargis, the
appellant in *Miller* conceded that she was unable to
perform the majority of functions normally associated
with being a correctional officer, but argued that she
could continue in the position if given the assignment of
either switchboard operator or armory officer.[5] We held,
however, that "if an employer has a legitimate reason
for specifying multiple duties for a particular job classi-
fication, duties the occupant of the position is expected
to rotate through, a disabled employee will not be quali-
fied for the position unless he can perform enough of
these duties to enable a judgment that he can perform its
*essential* duties." *Id.* at 485 (emphasis in original). The
reason for this is clear—"to be able to respond to unex-
pected surges in the demand for particular abilities." *Id.*

> The prison has to be able to call upon its full staff
> of correctional officers for help in putting down a
> prison riot, and therefore each officer must have
> experience in the positions, such as searching and
> escorting inmates, that provide the necessary training
> and experience for responding effectively to a riot,
> as well as the capability for such response.

*Id.* Obviously a prison riot is an extreme threat. But there
are many other duties that include disciplining pris-
oners, inspections, intervening in disputes, and dealing
with routine but sometimes tense situations that cannot
be subtracted from the performance expectations of a

---

[5]  An "armory officer" is "in charge of issuing guns to correc-
tional officers as needed." *Miller*, 107 F.3d at 485.

correctional officer. This necessary ability to respond to emergencies was the exact reason provided by Lyles for why Cook County correctional officers must be able to rotate through all positions. Like the Illinois Department of Corrections in *Miller*, it is the position of the Sheriff's Office that the ability to rotate through all positions, including the majority of them that involve inmate contact, is a prerequisite for someone being qualified to perform the essential functions of a correctional officer. Additionally, Dargis did not request placement in another position in the Sheriff's Office, but rather sought accommodation in order to retain his position as a correctional officer. Because the Sheriff's Office need not "manufacture a job that will enable the disabled worker to work despite his disability," *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000), Dargis's inability to rotate through the various positions of a correctional officer means that he cannot perform the essential functions of that job. Carving out a job that included very few of the duties all other correctional officers were expected to perform would have the effect of creating a new position for an employee who would not be otherwise qualified.

Dargis argues that there is a genuine issue of material fact regarding the existence of a requirement that correctional officers be able to rotate through all positions because he is aware of officers who were placed in positions in order to avoid inmate contact. During his deposition, Dargis stated that he supervised an officer named Barbara Siejka, and was directed by his supervisors to assign her to a position without inmate contact because she had a cardiovascular illness. Dargis was aware of another officer with the last name Bablicock who was

assigned to positions not involving inmate contact because she was in the habit of starting arguments with inmates. Finally, Dargis knew of an officer named Emil Jones who was assigned to the firing range after he suffered a stroke and returned to work with a cane.

If it is true that the Sheriff's Office regularly assigned officers with Dargis's restrictions to permanent positions where they were guaranteed no inmate contact, that fact might undercut the legitimacy of its assertion that all officers need to be able to rotate through the full gamut of correctional officer positions. However, these statements by Dargis are insufficient to create a genuine issue of material fact on that point. Dargis set forth no evidence tending to establish that any of these officers needed to avoid all inmate contact at all times, as in his own case. The closest call might be with Siejka, however Dargis could not recall if her medical or other paperwork required such an absolute accommodation.[6] Dargis's statements tell us very little about the other officers' conditions, the reasons for their assignment, or the completeness of their isolation from inmates. Additionally, Dargis is silent regarding the extent to which, if

---

[6] Additionally, Dargis stated during his deposition that Siejka, who was normally assigned to the lobby, would have been required to carry a weapon in that assignment. This requirement shows that the Sheriff's Office anticipated the possibility, however minimal, that even a correctional officer assigned to a specific position in order to avoid inmate contact might be involved in an altercation. It also reveals the difficulty, if not the impossibility, of attempting to accommodate someone with Dargis's limitations in the position of a correctional officer.

at all, these other officers shared Dargis's other medical requirements, such as avoiding most physical activity other than sitting, avoiding lifting, kneeling, stooping, or running, and staying in a temperature-controlled environment. Finally, even if the Sheriff's Office did assign some officers to positions where they were able to avoid inmate contact completely, Dargis's testimony does not show that such a position was available when he sought reinstatement, and that the Sheriff's Office overlooked Dargis for it. *Hansen*, 233 F.3d at 523 (noting that a "worker cannot demand that his employer give him a job for which there is no vacancy without shifting the worker who has that job to another job in order to create a vacancy for the disabled worker.").

Dargis further argues that the district court erred in granting judgment against him on his ADA claims because there was no evidence suggesting that the Sheriff's Office engaged in the legally required interactive process to determine whether his disability could be accommodated. *See E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (noting that "the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation") (quotation omitted). "When . . . the disabled worker has communicated his disability to his employer and asked for an accommodation so that he can continue working, the employer has the burden of exploring with the worker the possibility of a reasonable accommodation." *Hansen*, 233 F.3d at 523.

For certain, Dargis communicated his disability to the Sheriff's Office, thereby triggering its duty to engage Dargis in the process of exploring possible avenues of accommodation. However, while Dargis claims the Sher-

iff's Office failed to engage in the process, such failure "cannot give rise to a claim for relief . . . if the employer can show that no reasonable accommodation was possible." *Sears, Roebuck & Co.*, 417 F.3d at 805 (quotation omitted). Unfortunately, Dargis's disabilities—generally, that he could engage in very limited physical activity and have no inmate contact—were severe enough to bring the interactive process to a prompt end once they were made known. As set forth above, the Sheriff's Office showed through the statement of Lyles that correctional officers need to be able to rotate through all positions for reasons of safety and inmate control. This statement is supported by our prior decision in *Miller*, 107 F.3d at 485. The Sheriff's Office being able to make the required showing that no reasonable accommodation was possible, there was no further interactive process necessary. Its failure to engage in such interaction provides no basis for disturbing the district court's judgment.

In sum, we conclude that Dargis failed to meet his burden of establishing a prima facie case under the ADA because he was unable to show that he could perform the essential functions of a correctional officer. Dargis's knowledge of other officers who may have been assigned in order to avoid inmate contact does not create a genuine issue of material fact about the legitimacy of the Sheriff's Office's requirement that officers be able to rotate through all positions. Furthermore, because disabilities like Dargis's could not be reasonably accommodated, there was no need to engage in an interactive process regarding accommodation. Accordingly, we conclude that the district court committed no error in entering summary judgment in favor of the Sheriff's Office on Dargis's ADA claims.

### B. Due Process Claim

Dargis next argues that after finding that his procedural due process rights, as protected by both the United States and Illinois Constitutions, were violated, the district court ordered the wrong remedy by merely directing the Sheriff's Office to hold a Merit Board hearing pursuant to 55 ILCS 5/3-7012. Dargis claims that the appropriate course would have been for the district court to proceed to trial on his claim for damages, attorney's fees, and other appropriate relief. Thus, the only due process question before us is whether, after finding a violation, the district court's order for a hearing was the proper remedy. The Sheriff's Office states in its brief that while it does not agree that Dargis was unlawfully deprived of a property interest, it is assuming for argument's sake that such a violation occurred, and thus argues only that the district court's choice of remedies was correct.

Both the Fourteenth Amendment of the Constitution of the United States, and Article One, Section Two of the Illinois Constitution provide that a person shall not be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1; Ill. Const. of 1970, art. I, § 2. For an employee to have a constitutionally protected property interest in continued employment, that interest must be "created and defined by an independent source, such as state law or a contract." *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008). Here, Illinois law provided that "no . . . county corrections officer . . . shall be removed, demoted or suspended except for cause, upon written charges filed with the [Merit] Board by the Sheriff and a hearing before the Board thereon upon not less than 10 days'

notice at a place to be designated by the chairman thereof." 55 ILCS 5/3-7012. At this hearing, the officer would be "afforded full opportunity to be heard in his or her own defense and to produce proof in his or her defense." *Id.* The district court found that while Dargis was never terminated, the decision to stop paying him implicated a concrete benefit of the type that creates a property interest that may not be taken away absent the process set forth above. *See Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007) (distinguishing between mere acquisitional opportunities which do not implicate the Constitution, and vested benefits protected by nondiscretionary rules of which someone may not be deprived without due process). Although the district court concluded that Dargis was entitled to the hearing, it expressly stated that it had not considered the merits of Dargis's placement on "zero pay status," or his remedies under state law.

We conclude that the district court acted appropriately in directing the Sheriff's Office to conduct a hearing instead of proceeding to trial on damages. "Procedural due process rules are meant to protect persons not from the deprivation, but from the *mistaken or unjustified* deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (emphasis added). For this reason, where a plaintiff would have suffered the same fate had the required hearing been held, he is not entitled to recover damages caused by the suspension. *Id.* at 260 (agreeing with the court of appeals that to award damages for injuries caused by a justified suspension imposed without a hearing would amount to a windfall rather than compensation). If the placement of Dargis on involuntary unpaid leave was justified based on his physical condition, then awarding him the damages sought would result in the type of windfall discussed in *Carey*. Addition-

ally, based on its findings regarding Dargis's ADA claims, if the district court was the entity to consider whether Dargis's leave was justified, it would be placed in the incongruous position of considering whether to award compensation to Dargis in the form of lost wages for a job it had found him unable to perform. There is nothing in the record, however, indicating that Merit Board hearings are governed by the same standards as a federal ADA claim. Accordingly, we conclude that the district court correctly decided that the Merit Board could better determine whether Dargis's placement on involuntary unpaid leave was justified.

Furthermore, in declining to consider the merits of Dargis's placement on "zero pay status," the district court did not foreclose Dargis's opportunities for monetary relief. We have previously noted that an officer in Dargis's position can obtain back pay to which he is entitled by petitioning the Merit Board, initiating an action of mandamus, or, unless the applicable statute of limitations has run, filing suit under the Illinois wage payment statute. *Ellis v. Sheahan*, 412 F.3d 754, 756-57 (7th Cir. 2005) (citations omitted). Taking all of these considerations together, we conclude that the district court committed no error in directing the Sheriff's Office to conduct a hearing on Dargis's placement on "zero pay status" rather than proceeding to a damages trial itself.

### C. State Law Claims

Dargis next challenges the district court's decision not to exercise jurisdiction over his remaining state law claims, dismissing them instead without prejudice. In addition to Dargis's state due process claim, on which the district court ruled in his favor, Dargis stated claims for

violation of the Illinois Human Rights Act, 745 ILCS 5/2-102, respondeat superior against the Sheriff and Sheriff's Office, violation of the Illinois Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102, wrongful constructive discharge, breach of a collective bargaining agreement, violation of the Cook County Human Rights Ordinance, No. 93-0-13, and conspiracy to violate the Illinois Human Rights Act and the Cook County Human Rights Ordinance. A district court has the discretion not to exercise supplemental jurisdiction over pendent state law claims when it dismisses the claims over which it has original jurisdiction, 28 U.S.C. § 1367(c)(3), and we review that decision for abuse of discretion. *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007). We have held that the district courts should exercise this discretion to relinquish jurisdiction over state law claims that remain after the dismissal of federal claims unless any of the following three circumstances exists: (1) the state law claims may not be re-filed because a statute of limitations has expired, (2) substantial judicial resources have been expended on the state claims, or (3) it is clearly apparent how the state claims are to be decided. *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007).

Dargis does not argue that any of these three exceptions is present here, and we find no evidence of them in the record. Rather, Dargis first argues that by dismissing his state law claims without prejudice, the district court "relegat[ed] a desperate plaintiff to his adversary and nemesis and to the notoriously backlogged Cook County judicial system." However, the equal dignity of the state and federal courts, even to adjudicate federal claims, is a well-established principle of our legal system. *See Giles v. NYLCare Health Plans, Inc.*, 172

F.3d 332, 339 (5th Cir. 1999) (citing *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)). And regarding state claims, state courts can provide a better forum when the issue being considered is a state actor's compliance with state law. *Mid-Am. Waste Sys., Inc. v. City of Gary*, 49 F.3d 286, 291 (7th Cir. 1995). Accordingly, this argument provides Dargis no basis for relief.

Dargis next argues that dismissal of his state claims was inappropriate because all of his federal claims were not dismissed—judgment was actually entered in his favor on his federal due process claim. However, we see no problem with the district court's action because actual *dismissal* of all federal claims is not required for a district court to exercise the discretion afforded it regarding supplemental jurisdiction. Section 1367 itself allows dismissal of state law claims when they raise novel or complex questions of state law, or where they predominate over the federal claims, with no reference in either instance to dismissal of federal claims. 28 U.S.C. § 1367(c)(1) and (2). Moreover, "[t]he rationale of the supplemental jurisdiction is economy in litigation," *Williams Electronics Games*, 479 F.3d at 906, and we see no reason that a district court must entertain Dargis's seven state law claims, on which no other judicial resources have been expended, simply because it disposed of a federal due process claim in his favor. Accordingly, we conclude that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Dargis's state law claims.

### D.  Motion to Alter or Amend

Finally, Dargis asserts that the district court erred in denying his motion to alter or amend the judgment

entered against him. A review of this motion, however, reveals that the only grounds for relief it sets forth are identical to the first two issues we have considered on appeal. Because the district court did not commit error in its disposition of Dargis's ADA claims, nor in directing the Sheriff's Office to conduct a hearing instead of proceeding to trial, there was no basis for granting Dargis's motion. The district court therefore committed no error in denying it.

### III.

Because Dargis was unable to establish that he was qualified to perform the essential functions of the correctional officer position, he did not make out a prima facie case of discrimination under the ADA, and the district court did not err in entering judgment for the Sheriff's Office on those claims. Additionally, because the Merit Board was better suited to consider the justification for Dargis's placement on leave, and because those proceedings afforded Dargis an opportunity for monetary relief, the district court did not err in directing the Sheriff's Office to conduct a hearing before the Merit Board rather than proceeding to trial itself. Finally, we conclude that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Dargis's state law claims, and that there was no basis for granting Dargis's motion to alter or amend the judgment. Accordingly, we AFFIRM the district court's disposition of Dargis's claims.